1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   KATHLEEN A. KNOWLES,            )  Civil No. 11-0353-MMA(WVG)
                                     )
12                  Plaintiff,       )  REPORT AND RECOMMENDATION
                                     )  DENYING PLAINTIFF'S MOTION FOR
13   v.                              )  SUMMARY JUDGMENT AND GRANTING
                                     )  DEFENDANT'S MOTION FOR SUMMARY
14   MICHAEL J. AS TRUE,             )  JUDGMENT
     Commissioner of Social          )
15   Security,                       )  (DOC. NOS. 16, 19)
                                     )
16                  Defendants.      )
                                     )
17   _____ )

18

19                                  I

20                           INTRODUCTION

21        Plaintiff  Kathleen  A.  Knowles  ("Plaintiff"),  filed  a

22   Complaint for Review of the Final Decision of the Commissioner of

23   Social  Security  ("Complaint").  Defendant  Michael  J.  Astrue,

24   Commissioner of Social Security, ("Defendant"), filed an Answer to

25   the  Complaint  and  lodged  the  administrative  record  ("Tr."),

26   pertaining to this case.  Plaintiff has filed a Motion for Summary

27   Judgment.  Defendant has filed an Opposition to Plaintiff's Motion

28   for Summary Judgment and a Cross-Motion for Summary Judgment.

11cv0353

1   Upon examination of the entire record, the Court RECOMMENDS

2   Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's

3   Cross Motion for Summary Judgment be GRANTED.

4   II

5   PROCEDURAL HISTORY

6   On September 28, 2006 Plaintiff filed a claim for disability

7   benefits, and supplemental security income under Titles II and XVI

8   of the Social Security Act. (TR. 141 – 146; 147 – 150.)  On April

9   9, 2007, the Defendant denied the initial claim for benefits, and on

10  May 18, 2007, denied reconsideration. (TR. 59–60; 91.)

11  Plaintiff requested a hearing before an Administrative Law

12  Judge ("ALJ") which was held on December 15, 2008. (Tr. 17 – 58.)

13  Plaintiff, who was represented by counsel, appeared at the hearing

14  before ALJ Eva B. Godfrey. (Id.)  Following the hearing, at the

15  request of her representative, Plaintiff underwent an orthopedic

16  consultation with medical examiner Dr. Thomas Sabourin. Dr.

17  Sabourin's findings were incorporated into the decision of the ALJ.

18  The ALJ found that Plaintiff did not suffer from a disability as of

19  the date of her initial application through the decision date of May

20  28, 2009. (TR. 63 – 76.)

21  On September 25, 2009, Plaintiff appealed the ALJ's decision

22  to the Social Security Appeals Council.  On January 5, 2011, the

23  Appeals Council denied review of the ALJ's decision and the ALJ's

24  decision became the final opinion of the Commissioner. (TR. 1 – 5.)

25  On February 18, 2011 Plaintiff filed a Complaint in this Court for

26  Review of the Commissioner's Final Decision.

27

28

11cv0353

1                                 III

2                       STATEMENT OF FACTS

3       Plaintiff was born on September 5, 1957.  She began working

4 in 1975, accruing over thirty years of a sporadic work history. Over

5 the course of those thirty years, she earned an aggregate income of

6 approximately $65,000. (Tr. 27.) From 2002 - 2004, she worked as a

7 waitress, nurse assistant, and day laborer (responsible for

8 primarily cleaning-up construction demolition sites and laying

9 bricks). (Tr. 25-26.) She claims to have stopped working in 2004 due

10 to pain in both her feet and back, suffering from dizzy spells and

11 chest pain.[1]  (Id.)

12       Plaintiff claims to have become disabled as early as December

13 31, 2003, at the age of 46, however she filed her initial applica-

14 tion for disability benefits three years later, on September 14,

15 2006. (Tr. 22 - 23.) At the onset of her disability, Plaintiff

16 alleges to have experienced multiple heart attacks beginning in

17 2001. (Tr. 26.)  She also claims to have had two strokes, the last

18 occurring in 2006.  (Id.) She contends that her residual functional

19 capacity ("RFC") is less than sedentary, because she is required to

20 use a walker to assist with her mobility.  (Tr. 24-26; 57.)

21       The ALJ, applying the five step sequential analysis in 20

22 C.F.R. Section 416.920, found Plaintiff was not disabled in

23 accordance with the Social Security Act Section 1614(a)(3)(A).

24 Though the ALJ determined Plaintiff suffered from degenerative disc

25

26

27 ─────────────────────

28     [1]   References to Plaintiff's claims were taken from her testimony at the December 15, 2008 administrative hearing (Tr. 18 - 58), unless referenced to some other part of the administrative record.

11cv0353

1   disease, status post-ischemic attack[2], mild coronary artery disease[3]

2   ("CAD"), and chronic obstructive pulmonary disease[4] ("COPD"), these

3   conditions were not so debilitating as to restrict Plaintiff beyond

4   light work, with the limitations of occasional bending and crouch-

5   ing, the ability to alternate her position every 30 minutes and to

6   take asthma precautions.  (Tr. 68, 71 - 76.)   The ALJ, relying on

7   the opinion of a vocational rehabilitation specialist, determined

8   Plaintiff could perform work as a counter attendant, cashier,

9   telephone clerk, and assembler. (Tr. 75.)   The ALJ rejected the

10  notion that Plaintiff's RFC was less than sedentary due to her use

11  of a walker. (Tr. 25; 73 -74.)

12       Plaintiff contends that the ALJ erred in finding that she was

13  not disabled under sections 216(i)and 223(d)of the Social Security

14  Act, because the medical opinion of her treating physician, Denise

15  Parnell, M.D., who prescribed Plaintiff's walker, was ignored when

16  the ALJ determined her RFC. (Complaint, Doc. No. 16, 6-7.)

17

18

19       [2]     A transient ischemic attack is a stroke that comes and goes quickly.
20  It happens when the blood supply to part of the brain stops briefly.  Symptoms are
    like other stroke symptoms but do not last as long.  They happen suddenly, and
    include numbness or weakness, confusion or trouble speaking or understanding
21  speech, loss of balance or coordination.  Most symptoms disappear within an hour,
    although they may last for up to 24 hours.  MedlinePlus: A Service of the U.S.
22  National    Library    of    Medicine,
    http://www.nlm.nih.gov/medlineplus/transientischemicattack.html (Last updated Nov.
23  11, 2011)

    [3]     Coronary artery disease is a condition in which fatty plaque deposits
24  build up in the heart's arteries.  These plaque deposits cause arteries to become
    narrow and blocked, which restricts blood and oxygen flow to the heart muscle.
25  A.D.A.M. Medical Encyclopedia, (May 15, 2009)
    http://adam.about.net/reports/Coronary-artery-disease.htm

26       [4]     Chronic obstructive pulmonary disease is a lung disease typically
27  presented in the form of chronic bronchitis, involving long-term cough with mucus;
    or emphysema, involving destruction of the lungs over time. Some symptoms of COPD
    include fatigue, respiratory infections, shortness of breath that worsens with
28  mild activity, and wheezing. A.D.A.M. Medical Encyclopedia (May 11, 2011),
    http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/

4

11cv0353

A. <u>MEDICAL HISTORY</u>

   1. <u>TREATMENT WITH DOWNTOWN FAMILY HEALTH CENTER</u>

Beginning in 2005, Plaintiff received her primary care from Downtown Family Health Center ("DFHC"). (Tr. 30.) While Plaintiff treated at the facility, a number of providers cared for her. (Tr. 418; 350-361; 416-426; 446-473.)

In February 2005, Plaintiff initially sought treatment for pain in her sciatica and lumbar spine which radiated to her left hip traveling down to her knee. There is no indication that she suffered trauma at the onset of these symptoms. (Tr. 444.)

On September 21, 2006, Plaintiff was evaluated at DFHC by Stacey Burgin, Family Nurse Practitioner ("FNP"), Plaintiff requested the nurse complete paperwork on her behalf so she could obtain food stamps. Although at the time of the examination, Plaintiff used a wheelchair at the appointment, Nurse Burgin did not explain why the wheelchair was needed. (Tr. 356.) On the San Diego County[5] form, Nurse Burgin indicated Plaintiff was disabled due to COPD, CAD, rheumatoid arthritis[6], hypertension ("HTN"), and hyperlipidemia[7], with a fair-to-poor prognosis due to Plaintiff's impaired mobility. (Tr. 446-447.) She also opined that Plaintiff was unemployable until March 1, 2007. (<u>Id.</u>)

---

[5]    Nurse Burgin completed County of San Diego Department of Social Services Form, 16-3 DSS (5/84).

[6]    Prior to this assessment, the records do not report Plaintiff had an arthritis diagnosis, nor are there tests or findings contained in the record that support the existence of arthritis.

[7]    Hyperlipidemia is "an excess of lipids in the blood." The American Heritage Medical Dictionary (2007), http://medical-dictionary.thefreedictionary.com/hyperlipidemia

11cv0353

1    In October 2006, Plaintiff suffered a pre-syncope[8] episode

2    resulting in blurred vision, dizziness and slurred speech, which

3    lasted approximately three hours. (Tr. 353.) She was referred to

4    Scripps Mercy Hospital where, on November 1, 2006, an echocardiogram

5    test was performed. (Id.) This test revealed Plaintiff had a right

6    carotid moderate-to-severe stenosis[9]. (Tr. 343-348.) She was

7    referred to a vascular surgeon for consultation, who determined she

8    was not a surgical candidate. (Tr. 46, 352, 462.) Following this

9    episode, on October 13, 2006, Dr. Facick Tafara, gave Plaintiff a

10   prescription for a motorized wheelchair[10]. The Center for Medicare

11   & Medicaid Services ("CMS") denied payment for the electric

12   wheelchair. (Tr. 39.)

13       On February 6, 2007, Plaintiff saw Denise L. Parnell, M.D.,

14   to whom she complained of back, hip, knee and hand pain. (Tr. 419.)

15   At a follow-up appointment on March 3, 2007, Dr. Parnell noted that

16   Plaintiff "wants" a walker and bus pass (Tr. 417). At that examina-

17   tion, Dr. Parnell observed plaintiff had decreased range of motion

18   in her right hip and tenderness in her lumbar spine. X-rays of the

19   hip, knee and lumbar spine were requested (Id.) Dr. Parnell also

20   recorded that Plaintiff felt she could not work because "she can not

21   walk more than one block." (Id.) In May 2007, Plaintiff had not yet

22   _____

23       [8]    Pre-syncope is an "episode of near-fainting which may include
     lightheadedness, dizziness, severe weakness, blurred vision, which may precede a
     syncopal episode."

24   McGraw-Hill Concise Dictionary of Modern Medicine(2007), *available at*
     http://medical-dictionary.thefreedictionary.com/presyncope

25       [9]    Carotid Stenosis is the narrowing of the carotid artery (a key artery

26   located in the front of the neck through which blood from the heart goes to the
     brain). MedicineNet.com,
     http://www.medterms.com/script/main/art.asp?articlekey=39717 (Last updated Oct.

27   9, 2004)

28       [10]    While there is a prescription, the administrative record does not
     contain a corresponding report explaining the necessity for the wheelchair.

11cv0353

obtained her x-rays or physical therapy as prescribed by Dr. Parnell. (Tr. 462.) Most of Plaintiff's pain was in her right knee, hip and lumbar spine. (Id.) Furthermore, Plaintiff complained that she can not use a cane because "[it] doesn't hold her up." (Id.) Dr. Parnell prescribed Plaintiff a "walker with chair"[11]. (TR. 462.)

By June 19, 2007, Plaintiff still had not obtained x-rays of her spine and knee, however she continued to complain that she was unable to walk or stand and that cooking was difficult due to pain[12]. (Tr. 460.) Dr. Parnell noted the "walker with chair" prescription had been denied by CMS. (Id.) The doctor's assessment was that Plaintiff was overweight, suffering from chronic pain, hypertension and right carotid stenosis.(Id.)

On September 4, 2007, despite not having x-rays, Plaintiff once more complained of right knee pain. (Tr. 458.) When Dr. Parnell asked Plaintiff about the status of obtaining physical therapy, Plaintiff replied, "What's the point - I can't do physical therapy". (Id.) Dr. Parnell prescribed medication refills and gave Plaintiff a prescription for a regular walker, however, the doctor noted the use of the walker was to be on an "as needed"[13] basis.(Id.)

One year later, on September 30, 2008, Plaintiff sought treatment from Dr. Parnell for lumbar spine and mid-back pain. Once

---

[11]  There appears to be an inconsistency regarding whether Plaintiff obtained a regular walker or a "walker with chair". In a medical report dated June 19, 2007, it was noted that CMS denied a "walker with chair". (Tr. 462.) Later, Dr. Parnell prescribed a regular walker (Tr. 458), however at the administrative hearing, Plaintiff stated that CMS paid for a "walker with a seat" to assist with her mobility. (Tr. 42.)

[12]  No other objective testing had been performed to determine the source of Plaintiff's pain.

[13]  The record states, "order walker (regular) to use 'prn'". Prn is a medical abbreviation for the Latin term *pro re nata*, meaning "as the circumstances require or as needed". Medline Plus Medical Dictionary (2011), http://www.merriam-webster.com/medlineplus/prn

1   more, Dr. Parnell ordered x-rays for the lumbar and thoracic spine.

2   (Tr. 451.) On October 28, 2008, a medical report indicated that

3   Plaintiff obtained the x-rays, which revealed negative findings for

4   the thoracic spine and degenerative disc disease in the lumbar

5   spine[14]. (Tr. 450.)

6          2. ORTHOPEDIC CONSULTATION WITH THOMAS J. SABOURIN, M.D.

7          On March 10, 2009, Dr. Sabourin, a medical examiner for the

8   Department of Social Services, performed an orthopedic consultation

9   assessing Plaintiff's low back, greater tronchanters[15] and bilateral

10  knee complaints. (Tr. 514-519.) Dr. Sabourin obtained  a medical

11  history from Plaintiff. (Tr. 514.) Plaintiff claimed that x-rays

12  from previous examinations showed she had arthritis and degenerative

13  disc disease. (Id.) The actual x-rays were not provided for Dr.

14  Sabourin's review. (Id.)

15         Upon examination of Plaintiff's lumbar spine, Dr. Sabourin

16  noted her forward flexion was limited to 0 - 35 degrees, while

17  normal readings would be 0 - 90 degrees.  In extension and right and

18  left lateral flexions, she measured just under the normal range and

19  she fell within normal ranges in her right and left rotations. Dr.

20  Sabourin found unremarkable findings for various orthopedic tests[16].

21  _____

22  [14]   The actual x-ray impressions are not contained in the file. This

23  diagnosis was recorded in a DFHC medical report (Tr. 450). However, the report
    does not state at which level the degeneration had occurred or its severity.(Id.)

24  [15]   The tronchanters are points at which hip and thigh muscles attach.
    The greater tronchanter is a powerful protrusion located at the proximal (near)

25  and lateral (outside) part of the shaft of the femur.  The greater tronchanter
    gives attachment to a number of muscles including the gluteus medius and minimus,

26  piriformis, obturator internus and externus, and gemelli muscles. MedicineNet.com,
    http://www.medterms.com/script/main/art.asp?articlekey=39717 (Last updated April

27  27, 2011)

28  [16]   Dr. Sabourin performed Lasegue Testing (which tests straight leg
    raising), Trendelenburg Testing (which tests the valves of the leg veins) and
    Romberg Testing (which tests whether a patient becomes unsteady while standing

11cv0353

1    Plaintiff's range of motion in her upper extremities were

2   normal and painless. (Tr. 516.) The same was found for her hips,

3   ankles and feet. (Tr. 517.) Dr. Sabourin found no gross instability

4   in Plaintiff's knees. With regard to Plaintiff's station and gait,

5   he opined that "she walked quite well without her walker with no

6   specific limp." (Tr. 516.)

7    In fact, Dr. Sabourin could find no orthopedic reason why

8   Plaintiff required use of a walker. (Id.) He did observe that she

9   refused to walk without the walker during the examination, however,

10  upon further encouragement, Plaintiff walked quite well when he

11  substituted his hands for the walker. (Tr. 516-519.) Furthermore, Dr.

12  Sabourin opined that Plaintiff did "a lot of walking given the

13  callosities[17] and ground-in dirt on her feet." (Tr. 518.)

14   Despite the absence of x-ray results or MRI testing, Dr.

15  Sabourin found it likely that Plaintiff would have a non-disabling

16  degenerative disc disease common for her age. (Id.)  However, he

17  found it unlikely she suffered from rheumatoid arthritis based upon

18  her high hemoglobin[18] and hematocrit[19] levels, and he noted she did

19  not take medication for such an ailment. (Id.)  Finally, even though

20  Plaintiff claims to have suffered multiple strokes, Dr. Soubourin

21  found that her gait had not been altered as a result. (Id.)

22

23  with feet approximated, after closing their eyes). (Tr. 515.) Stedman's Medical
Dictionary (2006), *available at* http://www.medilexicon.com/medicaldictionary

24   [17]   Callosities is a marked or abnormal hardness and thickness (as of the
skin). Merriman - Webster's Medical Dictionary (Nov. 21, 2007) *available at*
25  http://dictionary.reference.com/browse/callosities

26   [18]   Hemoglobin is the oxygen-carrying pigment and predominate protein in
the red blood cells.  MedicineNet.com (April 27, 2011, 5:27:15 PM),
27  http://www.medterms.com/script/main/art.asp?articlekey=15738

28   [19]   Hematocrit is the proportion, by volume, of blood that consists of red
blood cells. MedicineNet.com (Nov. 3, 2008)
http://www.medicinenet.com/hematocrit/article.htm

11cv0353

1    In Dr. Sabourin's opinion, Plaintiff's RFC was restricted to

2  lifting, carrying, pushing or pulling objects that weigh 20 pounds

3  occasionally and 10 pounds frequently; and standing, walking or

4  sitting up to six hours of an eight-hour workday.(Id.)  He found that

5  she had no need for using a walker as a result of her orthopedic

6  complaints.(Id.)

7           3. INTERNIST CONSULTATION WITH AJIT RAISINGHANI, M.D.

8    On December 19, 2006, Dr. Raisinghani examined Plaintiff for

9  her stroke, carpal tunnel syndrome, heart attack, and mobility

10 complaints. (Tr. 362-63.) After taking Plaintiff's medical history

11 and conducting a physical examination, he diminished or negated many

12 of her complaints.

13    With respect to Plaintiff's carpal tunnel syndrome complaints,

14 she had negative findings for the Tinel's[20] and Phalen's[21] tests.  As

15 a result, Dr. Raisinghani found that Plaintiff does not have that

16 condition.(Tr. 366.)  He also determined at the time of the examina-

17 tion, Plaintiff had atypical symptoms of angina[22] with respect to her

18 heart complaints, and ischemic attack with no residual symptoms with

19 respect to her complaints of suffering from strokes. (Id.)

20

21

22    [20]   A positive Tinsel sign is commonly associated with carpal tunnel
23 syndrome.  It involves tingling in a specific anatomic distribution after slight
   percussion over the median nerve.  Frank L. Urbano, M.D., *Tinsel's Sign and
24 Phalen's Maneuver: Physical Signs of Carpal Tunnel Syndrome*; Hospital Physician
   (July 2000), *available at* http://www.turner-white.com/pdf

25    [21]   The Phalen's Maneuver is a wrist flexion test. Patients with carpel
26 tunnel syndrome will develop numbness and tingling within one to two minutes in
   the territory of the median nerve after holding wrists in forced flexion for
   approximately 60 seconds. Id.

27    [22]   "Angina is a type of chest pain caused by reduced blood flow to the
28 heart muscle. Angina is a symptom of coronary artery disease, [and is] typically
   described as squeezing, pressure, heaviness, tightness or pain in [the] chest."
   MayoClinic.com, (June 24, 2011), http://www.mayoclinic.com/health/angina/DS00994

1    Dr. Raisinghani observed that Plaintiff moved slowly and was

2    slow to respond to questions. Therefore, he opined that those

3    symptoms may require further evaluation. (Id.) He found it unclear

4    whether she suffered a specific organic brain disease. (Id.)

5    Dr. Raisinghani found that Plaintiff's RFC was limited to

6    occasionally lifting and carrying items no more than 20 pounds, and

7    frequently lifting and carrying items no more than 10 pounds.

8    Plaintiff could stand, walk, and sit up to six hours in an eight-hour

9    day, and she was allowed to bend or crouch occasionally. (Tr. 366.)

10    B. TESTIMONY AT THE ADMINISTRATIVE HEARING

11    1. TESTIMONY OF MEDICAL EXPERT, DR. STEINER[23/]

12    Dr. Steiner, serving in the capacity as a medical expert,

13    provided sworn testimony at the December 15, 2008 administrative

14    hearing. Following a review of the medical file, Dr. Steiner found

15    that Plaintiff did not undergo any medical work-up to support a need

16    for a walker or wheelchair in connection with her back complaints.

17    (Tr. 44.) In fact, Plaintiff offered no objective testing such as CAT

18    scans, MRIs, or x-rays, to support her claim. (Id.)

19    Though Plaintiff offered a medical report[24/] prepared at DFHC

20    as evidence of her condition, Dr. Steiner dismissed the report for

21    its lack of objective evidence. (Tr. 44-45.) Dr. Steiner opined it

22    was "incredible, or incredulous" that a person would be confined to

23    a wheelchair or walker without a medical work-up or referral to an

24

25    [23/]    The record bears no reference to Dr. Steiner's first name.

26    [24/]    Exhibit 17 F of the administrative record is three reports from Logan
27    Heights Family Health Center. It appears the second report, dated February 3,
     2005, is the one referenced in the testimony. This report contains the statement,
     "three months ago, back pain radiating through the hips, started in left leg
28    moderately." The report contains no objective evidence that substantiates those
     complaints. (Tr. 44-45; 444.)

11

1   orthopedist or neurologist. (Tr. 44.) Due to the lack of objective

2   medical testing, Dr. Steiner was unable to render an opinion

3   regarding Plaintiff's spinal complaints at the administrative

4   hearing. (Tr. 49.)

5             2. TESTIMONY OF VOCATIONAL REHABILITATION
                              SPECIALIST

6         Ms. Sinclair[25], a Vocational Rehabilitation Specialist,

7   provided testimony at the administrative hearing. She classified

8   Plaintiff's previous employment as waitress, cook and nurse assistant

9   as semi-skilled work, and construction laborer as unskilled. (Tr. 55-

10  56.)

11        The ALJ posed a hypothetical question to Ms. Sinclair

12  regarding the type of positions that were available for light work

13  with occasional bending and crouching with the added restriction of

14  alternating positions every 30 minutes. Ms. Sinclair found work as

15  a counter attendant, and cashier would meet that criteria. (Tr. 56.)

16        In a hypothetical question posed to Ms. Sinclair which

17  referred to a person who was restricted to sedentary work with the

18  ability to change positions every 30 minutes, and to avoid dust,

19  fumes, gases, excessive dust, toxic substances and hazards, Ms.

20  Sinclair found that a telephone clerk position or assembler would

21  meet that criteria. (Tr. 56-57.)

22        However Ms. Sinclair stated if an employee were required to

23  use a wheelchair or walker, they probably would be unable to sustain

24  employment in any of the positions discussed. (Tr. 57.)

25

26

27                              IV

28
    _____
         [25]/   The record bears no reference to Ms. Sinclair's first name.

                                                        11cv0353

1

<u>SUMMARY OF APPLICABLE LAW</u>

2   Title II of the Social Security Act, ("ACT") as amended,

3 provides for the payment of insurance benefits to persons who have

4 contributed to the program and who suffer from a physical or mental

5 disability.  42 U.S.C. § 423 (a)(1)(D). Title XVI of the Act provides

6 for the payment of disability benefits to indigent persons under the

7 Supplemental Security Income (SSI) program. § 1382 (a).  Both titles

8 of the Act define "disability" as the "inability to engage in any

9 substantial gainful activity by reason of any medically determinable

10 physical or mental impairment which can be expected to last for a

11 continuous period of not less than 12 months..." <u>Id.</u>  The Act further

12 provides that an individual:

13   shall be determined to be under a disability only if
    his physical or mental impairment or impairments are
14    of such severity that he is not only unable to do his
    previous work but cannot, considering his age, educa-
15    tion, and work experience, engage in any other kind of
    substantial gainful work which exists in the national
16    economy, regardless of whether such work exists in the
    immediate area in which he lives, or whether a spe-
17    cific job vacancy exists for him, or whether he would
    be hired if he applied for work. <u>Id.</u>

18

19   The Secretary of the Social Security Administration has

20 established a five-step sequential evaluation process for determining

21 whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920. Step

22 one determines whether the claimant is engaged in "substantial

23 gainful activity."  If he is, disability benefits are denied. 20 C.F.

24 R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker

25 proceeds to step two, which determines whether the claimant has a

26 medically severe impairment or combination of impairments.  That

27 determination is governed by the "severity regulation" at issue in

28 this case.  The severity regulation provides in relevant part:

11cv0353

If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience. §§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" [u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting." Id.

If the claimant does not have a severe impairment or combina-tion of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work he has performed in the past.  If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his previous work, the fifth and final step of the process determines whether he

11cv0353

is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. Benton v. Barnhart, 331 F.3d 1030, 1036 (9th Cir. 2003)[citing Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995)]. If the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so. Id. The ALJ must give consideration to the physicians' examining and treatment relationships; what support, including objective testing, relied upon; consistency of the opinions; physicians' specializations; and any other factors used to arriving at the opinions. 20 C.F.R. § 404.1527(d). If an ALJ fails to consider each 20 C.F.R. § 404.1527(d) factor before giving no weight to the opinions of a [plaintiff]'s treating specialist, then a federal court may remand the case; the ALJ should conduct the analysis on remand. Id.

V

ALJ'S FINDINGS

The ALJ made the following pertinent findings:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through June 30, 2005.

2. [Plaintiff] has not engaged in substantial gainful activity since December 31, 2003, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. [Plaintiff] has the following severe impairments: degenerative disc disease, status post transient ischemic

11cv0353

attack, mild coronary artery disease, and chronic obstructive pulmonary disease (20 CFR 404.1520(c)) and 416.920(c)).

[Plaintiff] underwent diagnostic cardiac catheterization in December 2001 after she experienced new onset episodes of chest pain (Exhibit 1F/50-93). The cardiac catherterization revealed 30% lesion in the LAD, normal right coronary and circumflex arteries, and normal left ventricular function. [Plaintiff] was diagnosed with mild coronary artery disease and was advised about the need to quit smoking..., exercise, and follow a low fat diet.

On July 7, 2004, [Plaintiff] was seen at Scripps Mercy Hospital because of chest pain (Exhibit 24F/21-36). She was held in the chest pain center overnight for observation. EKG revealed normal sinus rhythm and no ST elevations suggestive of ischemia, her troponins were negative, and her other labs were within normal limits. She was diagnosed with atypical chest pain and discharged the following day with instructions to continue on her current medications and follow up with her outside physician.

* * *

On December 19, 2006, [Plaintiff] saw Ajit Raisinghani, M.D., for a consultative internal medicine evaluation (Exhibit 4F.) [Plaintiff] reported having a history of two strokes resulting in difficulty with memory, carpal tunnel syndrome, a history of a heart attack, and difficult walking more than one-half block. On exam, [Plaintiff] did not appear to have any residuals. Her mental status, at least by a basic examination, appeared somewhat diminished in further evaluation. [Plaintiff] did not meet the criteria for carpal tunnel syndrome, and she had a negative Tinel's and Phalen's. Her chest pain was atypical for angina and Dr. Raisinghani noted the December 2001 catheterization was negative. With regard to [Plaintiff]'s difficulty walking, she did move slowly in the office, but it was unclear whether there was any specific organic brain disease – [Plaintiff]'s exam did not reveal a physical reason for the slow movements. Dr. Raisinghani opined [Plaintiff] could perform light work, i.e., lift/carry 20 pounds occasionally and lift/carry less than 10 pounds frequently and stand and/or walk and sit for up to six hours each in an eight-hour day.

On January 31, 2007, [Plaintiff] saw Frantz Derenoncourt, M.D., for evaluation of carotid artery disease (Exhibit 7F). [Plaintiff] reported having no recurrent symptoms related to her transient ischemic attack and no history of weakness in the upper or lower extremities. She was continuing to smoke one pack a day. She appeared in a wheelchair "apparently because of arthritis or COPD"

16

11cv0353

(Exhibit 7F/3).  She was scheduled carotid MRA to be followed with an endarterectomy if indicated.

On February 1, 2007, [Plaintiff] saw Dan Whitehead, Ph.D., for a consultative psychological examination (Exhibit 8F).  Dr. Whitehead took a history, performed a mental status exam and conducted neuropsychological testing. [Plaintiff] took public transportation to the evaluation and there was no mention of [Plaintiff] arriving in a wheelchair or with a walker. [Plaintiff]'s mental state exam was within normal limits, and she seemed to perform to good ability on all testing.  Her WAIS-3 Full Scale IQ score was in the low average range, her Verbal IQ score was low average range, her perfor-mance IQ was in the low average range, her Bender Gestalt II results were in the average range, and her WMS-3 Working Memory Index score indicated that her ability to use concentration, attentional abilities and memory processes was in the low average range.  Dr. Whitehead found no objective signs of serious cognitive impairment and opined [Plaintiff]'s prognosis was good and that she was fully capable of performing full range of simple and repetitive tasks.  Dr. Whitehead noted that if cognitive impairments were present around the time of her reported onset of problems, they seemed to have improved, at least when considering objective measures.

****

[Plaintiff] has been seen at Downtown Family Health Center since September 2006 for follow up care with regard to hypertension, coronary artery disease status post stroke in 2004, chronic obstructive pulmonary disease, generalized pain, medication refills and referrals (Exhibits 3F, 12F, and 22F).  On September 4, 2007, there is a note to order a regular walker for use on an as needed basis, but no medical reason for the walker was provided (Exhibit 22F/9).

[Plaintiff] also has a history of drug abuse (methamphet-amine and crack cocaine).  In July 2004, she reported being drug free for 15 years (Exhibit 24F/21). Then on January 12, 2005, she reported being clean for 25 days (Exhibit 17F/3).  In January 2007, she told Dr. Deroncourt she had been clean for two years (Exhibit 7F/4).  She also told Dr. Whitehead in February 2007 that she had been clean for two years (Exhibit 8F/2).

At the close of the hearing, the undersigned asked [Plaintiff]' representative if there were any outstanding treatment records.  Mr. Butt stated there were none outstanding, and he requested that the claimant be scheduled for a consultative orthopedic examination.  The undersigned agreed with this request in order to better assess the claimant's alleged orthopedic impairments.

11cv0353

Following the hearing, [Plaintiff] saw Thomas Sabourin, M.D., on March 10, 2009 for an orthopedic consultative examination (Exhibit 25F). [Plaintiff]'s primary complaint was that of low back pain since high school. Dr. Sabourin found no objective evidence of carpal tunnel syndrome or rheumatoid arthritis. Despite her complaints of having a stroke, she had no long track signs and her gait was relatively normal, although she used a walker and refused to try and walk without assistance. Dr. Sabourin noted that [Plaintiff] obviously does a lot of walking given the callosities and ground-in dirt on her feet. Dr. Sabourin opined that [Plaintiff] could perform light work. He also found no reason why [Plaintiff] needs a walker to walk since her strength, sensation and general neurological condition was not helpful in determining why she would need a walker.

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 an 416.926).

No physician has opined that [Plaintiff]'s condition meets or equals any listing, and the state agency program physicians opined that it does not. At the hearing Dr. Steiner testified that [Plaintiff]'s impairments, singly or in combination, do not meet or equal any listed impairment.

5. After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for: occasional bending and crouching; ability to alternate positions as often as every 30 minutes; and asthma precautions, i.e., avoid exposure to dust, fumes, gases, toxics and hazards.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 95-5p, 96-6p and 06-3p.

In considering [Plaintiff]'s symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce [Plaintiff]'s pain or other symptoms.

18

11cv0353

Second, once an underlying physical or mental impairment(s) that could be expected to produce [Plaintiff]'s pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of [Plaintiff]'s symptoms to determine the extent to which they limit [Plaintiff]'s ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

[Plaintiff] reports she cannot work due to a stroke, heart attack, breathing problems, arthritis and carpal tunnel syndrome (Exhibit 1E). As a result, her activities of daily living are very limited and she has difficulty lifting, squatting, bending, standing, walking, sitting, and kneeling because these activities hurt her back and knees (Exhibit 5E). She also has trouble breathing and spends most of the day lying down to relieve her pain and headaches (Exhibits 9E).

At the hearing, [Plaintiff] indicated one of the primary reasons she cannot work is because of back pain, degenerative disc disease and arthritis. She testified she could not even perform the job of handing out tickets at a movie theater because of pain in her lower back, arthritis and hip pain. She testified further that performing simple tasks take her a long time. For example, when she tried to bake cookies it takes her two hours, and she starts and stops a lot due to the need to sit down.

After careful consideration of the evidence, the undersigned finds that [Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

With regard [to Plaintiff]'s alleged back pain and other arthritic complaints, Dr. Steiner testified at the hearing that there are no work ups for this pain, and there are no x-rays, MRIs or other diagnostic tests to show or confirm a back and/or arthritic problem. [Plaintiff]'s representative referred to Exhibit 17F in support of the proposition that [Plaintiff] has undergone a diagnostic work up, but Dr. Steiner pointed out this was not a diagnostic work up; rather it is simply a statement or account of the claimant's complaints. In fact, if one looks at Exhibit 17F, there is a treatment note dated February 3, 2005, wherein the claimant reports a three month history of back pain with no history of trauma or

11cv0353

injury (Exhibit 17F/2). She was given an extremely cursory physical exam and was then diagnosed as having only back strain. Dr. Steiner also noted [Plaintiff] has not even been referred to, or treated by, an orthopedist or neurologist. Dr. Steiner testified further that the [Plaintiff] may well have limitations from her back pain, but there are certainly no records to document that the [Plaintiff] is disabled and cannot perform any work due to a back and/or arthritic problem.

At the hearing, [Plaintiff] testified she has used a walker or electric wheelchair since 2006. She testified further that she got a prescription for a wheelchair but CMS would not pay for it. So then she got a prescription for a walker from Dr. Parnell and CMS did pay for this about a year prior to the hearing. Likewise, [Plaintiff]'s friend states in a 3rd party function report that [Plaintiff] uses a wheelchair (Exhibit 4E). In a prescription pad note dated October 13, 2006, Facika Tafara, M.D., at Downtown Family Health Center wrote that [Plaintiff] needed a motorized wheelchair due to "multiple health conditions" (Exhibit 2F). At the hearing, Dr. Steiner testified it was simply unbelievable and incredulous that [Plaintiff] was prescribed the use of a wheelchair without any diagnostic tests being performed or being seen by an orthopedist or neurologist for further evaluation, let alone having had a diagnostic work up for the alleged back pain to assess the cause and severity of the back pain. In fact, Dr. Steiner opined it would be malpractice for someone of [Plaintiff]'s age to be confined to a wheelchair without a proper diagnostic work up and evaluation to substantiate the use of the wheelchair.

The undersigned agrees with Dr. Steiner's opinion and so finds, especially in light of the complete lack of diagnostic work up of [Plaintiff]'s back pain. In fact, a thorough orthopedic evaluation was performed at the request of [Plaintiff]'s representative following the hearing. Dr. Sabourin, who performed this exam, could find no basis for the need for a walker, let along (sic) a wheelchair, from an orthopedic viewpoint. In fact, this orthopedic evaluation showed no neurological deficits and only minimal findings on physical exam. [Plaintiff] told Dr. Sabourin she has had x-rays showing degenerative disc disease. As pointed out by Dr. Sabourin, given [Plaintiff]'s age, she would be expected to have a certain amount of degenerative disc disease, but age-related degenerative disc disease alone is not disabling.

[Plaintiff} alleges she cannot walk more than 1/2 block without collapsing in pain. However, Dr. Sabourin also opined it was obvious [Plaintiff] does a lot of walking given the callosities and ground-in dirt on her feet (Exhibit 25F/7).

****

[Plaintiff] does have chronic obstructive pulmonary disease. Unfortunately, this is due to her many years of heavy smoking. She has been smoking one or two packs a day for over 35 years and has not quit despite medical recommendations to do so. Nonetheless, she has not undergone work up for this, there are no pulmonary tests to document the severity of it, and she appears to have required minimal treatment for this impairment other than medication.

As for the opinion evidence, the undersigned gives moderate weight to the opinion of Dr. Steiner, who testified based on the records available at the hearing, [Plaintiff] could perform light work with the usual asthma precautions on account of her chronic obstructive pulmonary disease. The undersigned gives great weight to the opinions of the State Agency physicians, Dr. Raisinghani, and Dr. Sabourin, who all concluded [Plaintiff] could perform light work. However, in light of the claimant's subjective complaints, the undersigned finds that she must be allowed to alternate positions up to every 30 minutes.

Finally, the undersigned has considered the following submissions: 1) a prescription pad noted(sic)dated February 18, 2005 wherein Tanya Kapka, M.D., at Logan Heights Family Health Center, states [Plaintiff] is "disabled because of cardiovascular disease" (Exhibit 21F); 2) a prescription pad note dated September 21, 2006, wherein Stacey Burgin, F.N.P., at Downtown Family Health Center, states [Plaintiff] has "disability based on COPD, CAD, and arthritis" (Exhibit 19F); and 3) a form completed by Stacy Burgin, FNP, on September 21, 2006 wherein it is reported [Plaintiff] is unemployable until March 1, 2007, for the purposes of receiving county services (Exhibit 18F).

According to the evidence of record, Dr. Tran saw [Plaintiff] only once in February 2005 (Exhibit 17F). In any event, reports from physicians, including cardiologists, clearly document [Plaintiff] does not have a disabling cadiovascular disease (Exhibits 1F, 2F, 4F, 23F, and 24F). With regard to exhibits 19F and 21F, these are entitled to less weight since they were completed by a nurse practioner and not a physician. With regard to the form for county services, it states only that [Plaintiff] is unable to work for a period of 5 or 6 months and not on a long term basis. In addition, her opinions are not supported by objective medical evidence. In fact, Nurse Burgin's opinions are clearly contradicted by the opinions of physicians who performed thorough physical evaluations both from cardiac and orthopedic perspectives. Accordingly, the undersigned cannot give significant weight to these statements since they are

11cv0353

brief, conclusory, and inadequately supported by clinical findings (20 CFR 404.1527(d)(2)and 416.927(d)(2)).

In sum, the above residual functional capacity assessment is supported by the State Agency physician assessments and the opinions of Dr. Raisinghani, Dr. Sabourin, and Dr. Steiner, who all concluded [Plaintiff] could perform a broad range of light work.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

[Plaintiff] had past relevant work as a waitress, construction laborer, cook, and nurse assistant. At the hearing, the vocational expert testified these jobs are classified as follows: waitress, semi-skilled work at the light exertional level (DOT#311.477-030); construction laborer, unskilled at the very heavy exertional level (DOT#869.687-026); cook, semi-skilled at the light exertional level (DOT#313.374-014); and nurse assistant, semi-skilled at the medium exertional level (DOT#355.674-014). Hypothetically assuming [Plaintiff]'s residual functional capacity as found above, the vocational expert opined that [Plaintiff] would not be able to perform any of her past work. The undersigned accepts the testimony of the vocational expert and so finds. Accordingly, [Plaintiff] was unable to perform past relevant work.

********

10.   Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

In determining whether a successful adjustment to other work can be made, the undersigned must consider [Plaintiff]'s residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.   If [Plaintiff] can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon [Plaintiff]'s specific vocational profile (SSR 83-11). When [Plaintiff] cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations (SSRs 83-12 and 83-14).   If [Plaintiff] has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (sic) (SSR 85-15).

If [Plaintiff] had the residual functional capacity to perform the full range of light work, a finding of "not

disabled" would be directed by Medical-Vocational Rule 202.21 and Rule 202.14. However, [Plaintiff]'s ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent of which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the [Plaintiff]'s age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: counter attendant (DOT#311.477-014)with 1,800 jobs regionally and 85,000 jobs nationally; cashier (DOT#211.462.010)with 8,600 jobs regionally and 981,000 jobs nationally; telephone clerk (DOT#237.367-046) with 1,100 jobs regionally and 96,000 jobs nationally; and assembler (DOT#700.687-026) with 800 jobs regionally and 100,000 jobs nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the [Plaintiff]'s age, education, work experience, and residual functional capacity, the [Plaintiff] is capable of making a success-ful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from December 31, 2003 through the date last insured on June 30, 2005 and the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

DECISION

Based on the application for a period of disability and disability insurance benefits filed on September 14, 2006, [Plaintiff] is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on September 14, 2006, [Plaintiff] is not disabled under section 1614(a)(3)(A) of the Social Security Act.

VI

STANDARD OF REVIEW

11cv0353

A [D]istrict [C]ourt may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are not supported by substantial evidence." Sprague v. Bowen, 812 F.2d 1226, 1229 (9th Cir. 1987); *see* Villa v. Heckler, 797 F.2d 794, 796 (9th Cir. 1986).  The [C]ourt cannot affirm the Commissioner's final decision simply by isolating a certain amount of supporting evidence.  Rather, the [C]ourt must examine the administrative record as a whole.  Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990). Yet, the Commissioner's findings are not subject to reversal because substantial evidence exists in the record to support a different conclusion.  See, e.g., Mullen v. Brown, 800 F.2d 535, 545 (6th Cir. 1986). "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." Matthews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993); see Thompson v. Schweiker, 665 F.2d 936, 939 (9th Cir. 1982).  The Commissioner's decision must be set aside, even if supported by substantial evidence, if improper legal standards were applied in reaching that decision.  See, e.g., Benitez v. Califano, 573 F.2d 653, 655 (9th Cir. 1978).

VII

DISCUSSION

A.   THE ALJ PROPERLY APPLIED THE CORRECT STANDARD TO THE MEDICAL OPINIONS IN THE ADMINISTRATIVE RECORD WHEN SHE DETERMINED THAT PLAINTIFF WAS NOT DISABLED

Plaintiff contends she was denied Social Security disability benefits because the ALJ erred in ignoring the medical opinion of her treating physician, Dr. Parnell, who prescribed Plaintiff a walker.  Plaintiff states the ALJ's determination that she can

11cv0353

perform light work except for: occasional bending and crouching; ability to alternate position as often as every 30 minutes; and asthma precautions, (Tr. 71) was in error because she is required to utilize a walker which greatly diminishes her abilities to perform basic work functions. Therefore, the Commissioner's decision should be reversed or in the alternative remanded to the administrative level for appropriate reconsideration. (Complaint, Doc. No. 16, p.8.)

Defendant contends that there was no legal error when the ALJ did not weigh Dr. Parnell's reports because they are not medical opinions in accordance with 20 C.F.R. § 404.1527 (a)(2), and there is substantial evidence, taking the entire record into consideration, to support the ALJ's RFC assessment.

There are two issues before this Court: first, whether the ALJ should have considered Dr. Parnell's medical reports as medical opinions in accordance with 20 C.F.R. 404.1527, and second, whether there was substantial evidence supporting the ALJ's decision to disregard Plaintiff's walker when considering her RFC.

### 1.   DR. PARNELL'S REPORTS ARE NOT MEDICAL OPINIONS PURSUANT TO 20 C.F.R. § 404.1527; THE ALJ PROPERLY WEIGHED THE MEDICAL OPINIONS CONTAINED IN THE ADMINISTRATIVE RECORD

"Medical opinions are statements from physicians or psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [any] impairment(s), including ... symptoms, diagnosis and prognosis, what [one] can still do despite the impairment(s), and [any] physical or mental restrictions." 20 C.F.R. Section 404.1527 (a)(2).

11cv0353

1    Here, Dr. Parnell's reports are not medical opinions pursuant

2   to 20 CFR § 404.1527(a)(2). In order for these reports to constitute

3   medical opinions for the purposes of the Social Security Act, the

4   doctor's assessments must be supported by objective evidence,

5   provide an independent opinion of the Plaintiff's functional

6   limitations, and measure the severity of Plaintiff's impairments.

7   (Id.) While these reports record Plaintiff's symptoms and self-

8   assessments[26/], they do not contain the doctor's independent

9   diagnosis, prognosis, or determine the severity of Plaintiff's

10  impairments.   The impressions recorded in Dr. Parnell's reports,

11  regarding Plaintiff's limitations, such as Plaintiff "can not walk

12  more than one block", or that she has "trouble cooking" (Tr. 459-

13  460), are simply Plaintiff's subjective complaints regarding her own

14  limitations.   In one report, Dr. Parnell recorded that Plaintiff

15  "believes she can not work because of her mobility issues." (Tr.

16  417.) However, these complaints are not, supported by "acceptable

17  clinical and laboratory diagnostic techniques." 20 C.F.R. §

18  404.1527(a).

19    Even though Dr. Parnell's reports are not medical opinions,

20  the ALJ appropriately applied the specific and legitimate standard

21  to the reporting of Dr. Parnell and to the actual treating physi-

22  cians' opinions contained in the record.

23    "Although a treating physician's opinion is generally

24  afforded the greatest weight in disability cases, it is not binding

25

26   [26/]   Plaintiff represented to Nurse Burgin, and Dr. Parnell that she had
    arthritis. (Tr. 419; 446.) Neither conducted independent objective testing to
    verify this diagnosis. Also, Plaintiff told Dr. Sabourin, she had arthritis
27  verified by previous x-rays. However there are no x-ray results in the
    administrative record and no mention of any x-ray taken while Plaintiff was
28  seeking care at DFHC, or anytime prior, that diagnosed Plaintiff with arthritis.
    (Tr. 514.)

11cv0353

on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." McLeod v. Astrue, 640 F.3d 881, 884 (9th Cir. 2011), quoting Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001); see also Lester v. Chater, 81 F.3d at 830. Furthermore, "[t]he ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). However, when the treating doctor's opinion is contradicted by another physician, including an examining physician or a non-examining physician, the Commissioner must provide 'specific and legitimate reasons' in the record for rejecting a treating physician's opinion, supported by substantial evidence. Lester, 81 F.3d at 830.

Specific and legitimate reasons are established when the ALJ "[sets] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes, 881 F.2d at 751. The ALJ must not only offer his conclusions, but he also must "set forth his own interpretations and explain why they, rather than the doctors', are correct." Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007), quoting Embrey v. Bowen, 849 F.2d 418, 421-422 (9th Cir. 1988); See Hutchens v. Astrue, 2009 WL 1762570 at *2 (9th Cir. 2011)(the ALJ's observa- tion that the opinions of the treating doctors were inconsistent with claimant's daily activities was a 'specific and legitimate' reason for giving them little weight. See McCoy v. Astrue, 405 Fed.Appx. 222 at *1 (9th Cir. 2010) ("[t]he ALJ's statements regarding the medical evidence as it related to the conflicting medical opinions provided a specific and legitimate explanation for rejecting the treating physician's conclusions."). The ALJ may

11cv0353

1   discount a treating physician's opinion if it is presented in the

2   form of a check list and does not have supportive objective

3   evidence, and is contradicted by other statements and assessments of

4   claimant's medical condition. <u>Batson v. Comm. of Social Security</u>,

5   359 F.3d 1190, 1195 (9th Cir. 2004)

6        The ALJ recognized that Dr. Parnell prescribed the walker

7   (Tr. 72), then quickly noted that the walker prescription was

8   questioned by medical examiner Dr. Steiner. (<u>Id.</u>) As discussed

9   above, Dr. Parnell's reporting does not constitute a medical

10  opinion, that would require weighing against the other medical

11  examiners' opinions.  However, the ALJ's comparison of the evidence

12  in the record against the medical examiners' opinions is a specific

13  and legitimate explanation. Therefore the ALJ applied the appropri-

14  ate standard when considering Dr. Parnell's reports.

15       To the extent that any of the DFHC reports may be considered

16  medical opinions, the ALJ properly considered and applied little

17  weight to the opinions of Dr. Tafara and Nurse Burgin. Both of these

18  providers offered their impressions that Plaintiff was disabled as

19  a result of her multiple diagnosis.  However, neither of these

20  providers offered assessments supported by objective evidence.  With

21  respect to Nurse Burgin's September 21, 2006 report that found

22  Plaintiff to be unemployable through March 1, 2007, the ALJ noted

23  that finding disability over a span of a few months is not suffi-

24  cient to find a person disabled in accordance with the Social

25  Security Act[27/].  The ALJ also considered that Nurse Burgin is a nurse

26  practioner, while those contradicting her opinions were physicians

27

28          [27/]   The Social Security Act requires a person to be disabled for at least
        12 months to qualify for benefits. 20 C.F.R. § § 423(d)(1)(A); 1382c(a)(3)(A)

11cv0353

and specialists in their areas of expertise. These are all "specific and legitimate" reasons to give little weight to Nurse Burgin's opinions in favor of the opinions of Dr. Raisinghani and Dr. Sabourin, who both performed thorough examinations of Plaintiff and supported their opinions with objective evidence. Furthermore, rather than merely state Plaintiff has a disability, both medical examiners identified Plaintiff's RFC as a result of her impairments, and both rejected the notion that Plaintiff required the use of a walker because of her conditions.

As a result, the ALJ properly gave specific and legitimate reasons as to why she assigned little weight to the opinions of Dr. Tafara and Nurse Burgin and greater weight to the opinions of Dr. Raisinghani and Dr. Sabourin.   Furthermore, the ALJ acknowledged that Dr. Parnell prescribed a walker and then quickly dismissed the necessity for that prescription in light of Dr. Steiner's testimony. Therefore, the Court is satisfied that the ALJ committed no legal error, as the specific and legitimate standard was appropriately applied.

## 2. THERE IS SUFFICIENT EVIDENCE THAT THE WALKER IS NOT A NECESSARY TREATMENT MODALITY

The Court must consider whether the record contains sufficient evidence to support the ALJ's findings. Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion". Richardson v. Perales, 402 U.S. 389, 401 (1971).

With respect to Plaintiff's use of the walker, the Court rejects Plaintiff's contention that she is required to use the

11cv0353

walker as prescribed by Dr. Parnell. There is sufficient evidence to support that the actual prescription for the walker was based upon the subjective complaints of Plaintiff, not Dr. Parnell's objective assessment. For instance, Plaintiff began to request a walker because of pain in February 2007. Despite numerous requests by Dr. Parnell for Plaintiff to obtain x-rays and physical therapy, Plaintiff failed to obtain x-rays or physical therapy. Finally, four months later, Dr. Parnell acquiesced to Plaintiff's requests for a walker prescription, however, she did so on an "as needed" basis. (Tr. 458.) Therefore, the actual use of the walker was at Plaintiff's discretion, not mandated by her physician. This notion negates Plaintiff's contention that she must comply with the treatment choice of her physician in compliance with the Social Security Act[28]/,in order to qualify for benefits.

On the contrary, even if Dr. Parnell mandated Plaintiff to utilize the walker at all times (which she did not) (Tr. 38), non-compliance with this order would not bar Plaintiff from receiving Social Security benefits because the walker would not restore Plaintiff's ability to work.  Furthermore, Plaintiff has a history of failing to comply with Dr. Parnell's treatment recommendations. On two prior occasions, Plaintiff ignored Dr. Parnell's recommendations when she failed to obtain physical therapy to address her back pain complaints and when she waited nearly two years, to obtain x-rays of her thoracic and lumbar spine. (Tr.450-451.)

---

[28]/Plaintiff contends the Code of Federal Regulation mandates that she must follow prescribed treatment of her physician. The regulation states: In order to get benefits, [Plaintiff] must follow treatment prescribed by [her] physician if this treatment restores [her] ability to work. 20 C.F.R. §§ 404.1530. Likewise, 20 C.F.R § 416.930 also states Plaintiff must follow the prescribed treatment, "if this treatment can restore [her] ability to work..."

11cv0353

1    The ALJ also took into consideration, *inter alia*, Plaintiff's
2    testimony with respect to her symptoms, which she found not to be
3    credible to the extent that they are inconsistent with Dr. Sabourin
4    and Dr. Rasinghani's RFC assessments. (Tr. 72.) Given that Dr.
5    Parnell relied on Plaintiff's account of her symptoms as the
6    determinative factor for prescribing the walker, the medical
7    evidence the ALJ relied upon to dismiss the Plaintiff's credibility
8    is also substantial and reasonable in supporting the ALJ's decision
9    to dismiss Plaintiff's need for the walker.

10   The ALJ properly took into consideration the entire record,
11   including the examination by Dr. Sabourin, which was conducted
12   following the hearing, at Plaintiff's request. (Tr. 417; 458; 460.)
13   Dr. Sabourin conducted a physical examination, orthopedic and
14   neurological testing, and found the Plaintiff did not need the
15   walker to ambulate. (Tr. 516-519.) He noted she was able to balance
16   and walk quite well without it. (Tr. 516-519.) He further observed
17   that Plaintiff had ground-in dirt and callouses on the soles of her
18   feet, indicating she did a considerable amount of walking. (Id.)

19   Therefore, the Court is satisfied that the administrative
20   record contains substantial evidence to support the final decision
21   of the ALJ finding that the Plaintiff's RFC is limited to light work
22   except for occasional bending and crouching; ability to alternate
23   position as often as every 30 minutes; and asthma precautions. (Tr.
24   71.)

25                                VIII

26                   CONCLUSIONS AND RECOMMENDATION

27   After a review of the record in this matter, the undersigned
28   Magistrate Judge RECOMMENDS that the Plaintiff's Motion for Summary

11cv0353

1    Judgment be DENIED and Defendant's Cross Motion for Summary Judgment

2    be GRANTED.

3         This Report and Recommendation of the undersigned Magistrate

4    Judge is submitted to the United States District Judge assigned to

5    this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).3.

6         **IT IS ORDERED** that no later than <u>December 30, 2011</u>, any party

7    to this action may file written objections with the Court and serve

8    a copy on all parties. The document should be captioned "Objections

9    to Report and Recommendation."

10        **IT IS FURTHER ORDERED** that any reply to the objections shall

11   be filed with the court and served on all parties no later than

12   <u>January 13, 2012</u>. The parties are advised that failure to file

13   objections within the specified time may waive the right to raise

14   those objections on appeal of the Court's order. <u>Martinez v. Ylst</u>,

15   951 F.2d 1153 (9th Cir. 1991).

16

17   DATED:  December 2, 2011

18

19                              _____

20                              Hon. William V. Gallo
                                U.S. Magistrate Judge

21

22

23

24

25

26

27

28

11cv0353